· (43 App. Div. 60.)

### PEOPLE ex rel. VEILLER v. BRADY. ·

(Supreme Court, Appellate Division, First Department. .July 18, 1899.)

MUNICIPAL CORPORATION—REMOVAL FROM OFFICE—REVIEW.

Under Greater New York Charter (Laws 1897, c. 378) § 1543, which provides that no head of a bureau or regular clerk shall be removed until after an opportunity to explain, where a clerk fails to make intelligent answers to questions by the head of his department as to his duties under a previous administration, and without authority uses his superior's name in the transaction of an important part of the business of the department, the action of the head of department in removing him will not be disturbed, where he acted fairly in the exercise of his judgment.

Certiorari, on the relation of Lawrence Veiller, to review the action of the respondent, Thomas J. Brady, as commissioner, in removing the relator from his position as a clerk in the department of buildings. Writ dismissed.

Argued before VAN BRUNT, P. J., and BARRETT, McLAUGHLIN, PATTERSON, and INGRAHAM, JJ.

Julius M. Mayer, for relator.
John D. Quincy, for respondent.

BARRETT, J. The relator, though not entitled to a regular trial, as are police officers and firemen, could only be removed for cause, after an opportunity of making an explanation. This was his right. Laws 1897, c. 378, § 1543. And the cause, as we held in People ex rel. Mitchell v. Lagrange, 2 App. Div. 444, 37 N. Y. Supp. 991, affirmed in 151 N. Y. 664, 46 N. E. 1150, must be substantial,— pointing to some dereliction or neglect of duty, or affecting his character or fitness for the position. In the present case the charges, upon their face, were certainly substantial. They involved dereliction and neglect of duty. To make this clear, we need only quote the first and second of these charges. They read as follows:

"(1) Omission to properly perform your duty as clerk in the department of buildings, and neglect and disobedience of order of the commissioner of buildings, in making a false and misleading report to the commissioner of buildings. When called upon to state in writing the duties performed by you under the former administration, you failed to report as part of your duties the examination and dismissal of violations and other cases, and for such purpose your right to use the name of the superintendent of buildings. (2) Dismissing violations and other cases without the consent and authority of the commissioner of buildings."

The question then is, was the relator's explanation sufficient? Here, again, under the Mitchell Case, supra, he was entitled to fair consideration. If his explanation was such as should have satisfied a fair-minded man, if it admitted of no reasonable inference of dereliction or ·neglect, it could not be denied its due effect. In other words, if the explanation was clearly satisfactory, the respondent should have been satisfied with it.

We have gone over the record carefully in the light of these rules, and we find it impossible to say that the relator's explanation admitted of no reasonable inference of dereliction or neglect. We refer to the first charge, and the explanation given with respect

thereto. In considering this charge and the relator's explanation, we must look at the surroundings. The respondent became commissioner of buildings on the 1st day of January, 1898. One of his first acts was to require the employés in his department to furnish him with certain data. They were to give their names, residences, positions, dates of appointment, and salaries. Each employé was to state whether he had passed a civil service examination, and whether he was a veteran. He was also required to define his duties, and to state whether there had been any change in these duties since his appointment. This was a judicious step on the new commissioner's part. He had just come into a most responsible office. It was of the utmost importance that he should have precise information as to its practical workings, and especially as to the duties performed by its numerous employés. Upon the efficiency of these employés in the performance of their special duties the success of the respondent's administration largely depended. The least that the commissioner, under these circumstances, had a right to expect from each of the employés, was a full and clear statement of his duties, free from reserve, and adequate to enlighten the head of the office as to the powers with which the employé was being intrusted. The relator's case was especially in this category. Originally his work was purely clerical, but he had been advanced until, when the respondent came in, his duties had become most important. Mr. Constable, the respondent's predecessor, had given the relator authority either finally to dismiss what are called "cases," or to cancel them and have new cases made. These so-called cases consisted of the material upon which the department acted in enforcing the provisions of the building law, and in checking violations thereof. The relator had discretionary power to hold these cases back, or to forward them to the attorney for the department. As Mr. Veiller himself testified, "It depended entirely upon me whether cases should go to court or not." These certainly were great powers,—powers of the vesting of which in any one clerk it was eminently proper that the new commissioner should be advised. The fact is undisputed that Mr. Veiller never directly informed the respondent that he possessed these powers, or that his duties called for their exercise. In his answer to the respondent's request for a definition of his duties, the relator stated that he had "general charge of all cases in attorney's office prior to actual suit," and that he was "special assistant to superintendent of buildings, seeing the public," and that he was "in charge of superintendent's private office." The statement that he had general charge of all cases in the attorney's office prior to actual suit could not well have suggested the absolute power finally to dismiss such cases, or to cancel them and commence anew, and to bring them into court, or not, as he saw fit. This power was the crucial fact which should have been promptly disclosed. It is suggested that the power was inferable from what was stated. A more accurate view of the relator's statement is that the power might possibly have been divined therefrom. It cannot fairly be said that the respondent was reasonably required to draw the suggested inference. Certainly it is not the inference

which Mr. Veiller himself drew from the statement, nor is it the construction which he placed upon it; for, when he was asked this question by the respondent: "Q. Did you inform me that you possessed such power?"—he replied: "No, sir; but in a later communication, of January 5th, I did. On January 5th I wrote you, stating those facts, but received no reply." It is thus apparent that Mr. Veiller realized the insufficiency of his original reply to the respondent's request, and it remains to be considered whether he supplied the required information in this subsequent letter. The letter reads as follows:

"January 5th, 1898.

"Hon. Thomas J. Brady, Commissioner of Buildings—Dear Sir: I would respectfully request instructions from you as to whether you wish me to continue to do the same kind of work for you that I was in the habit of doing for Mr. Constable. All of this work involved the use of Mr. Constable's signature, permission to use which was granted to me by him. The routine work of the department will necessarily accumulate, unless the work that I have been in the custom of doing is done; and, as I do not wish such work to accumulate without your knowledge, I respectfully refer the matter to you, and ask further instructions.

"Yours, respectfully, Lawrence Veiller."

There is a question of fact as to whether the commissioner received this letter. It was not proved that the letter was ever delivered to him. The relator testified that he handed the letter to Miss Rose O'Brien, who was then acting as the respondent's secretary, and that it was placed upon the respondent's desk. The respondent stated upon the hearing that he had received no such communication. It seems peculiar, under these circumstances, that the relator neither called Miss O'Brien as a witness, nor—were this inadmissible—asked permission to have her interrogated on the subject. Assuming, however, that the letter should have been considered as a part of the relator's explanation, and as indicative of his honest intention to convey the information required, it seems to us that the letter is even less satisfactory than Mr. Veiller's original statement. In fact, it apparently justified the characterization of the information actually given as "misleading." The relator in this letter still entirely fails to disclose the powers to which we have referred. How was the respondent to divine from anything contained therein that the kind of work which Mr. Veiller was "in the habit of doing for Mr. Constable" involved absolute discretion as to the dismissal of cases? What the respondent asked was a definition of the duties which the relator was in the habit of performing. The letter was silent as to these duties. And what was there in the reference to the probable accumulation of routine work to call any one's attention to the power in question? There was surely nothing of a routine character in the dismissal of cases upon the exercise of judgment, in the holding back or forwarding of cases to the attorney, or in the recalling of papers from the attorney's office. To speak of such duties as "routine work" was clearly "misleading," and it may well be that it was that expression which prevented further inquiry on the respondent's part. It may also account for the fact that Mr. Veiller received no reply to this communication. For, if it was

but mere routine work which the relator was in the habit of doing, the respondent would naturally dismiss the subject. It is true that in this letter the relator informs the respondent that he had permission to use Mr. Constable's signature. So far he was explicit. But he nowhere suggested, directly or indirectly, the nature of the particular duty which called for the use of the commissioner's signature. The statement on that head simply conveyed the idea that the commissioner's signature was being used by the relator when he was doing the undisclosed work that he was in the habit of doing, or when he was doing the routine work of the department. The point is that the new commissioner was still left entirely in the dark as to the important powers which the relator was exercising,— powers which the relator admits he had not previously disclosed, and which, as he realized when he wrote the letter, he was called upon to disclose. It seems strange that when the relator sat down, as he says he did, to write a letter "stating these facts" as to his powers and duties, the obscure and meager communication under consideration should have been the sole product. It is said that many of these "violations" were trivial and technical, or unsupported by evidence. But it was for the relator to say whether they were such. Whether the violations were great or small, serious or trivial, were questions for his determination. It is apparent, therefore, that the respondents' request for information was never complied with. It is true, as argued, that he could doubtless have informed himself on the subject by making an independent inquiry. But the same criticism would apply to his attitude with regard to the entire body of clerks. They, too, might, in response to the respondent's request, have given him inaccurate or but partial information. But would it be any answer to an accusation on that head that the commissioner should have spent his time in searching the books of the department, or in going about and making specific inquiries either of the clerks themselves or of others? It seems reasonable that a busy man, upon whose time the public had just claims, should try to economize that time as he did here, and get at the bottom of the system which he was called upon to administer, by requiring a direct report in writing from each employé. The failure loyally to respond to such a request, or to furnish full and accurate information as required, was, in our judgment, a substantial cause for removal. That cause existed here, and it was not clearly and satisfactorily explained. To say the least, the explanation admitted of a reasonable inference of dereliction and neglect.

The second charge was a natural sequence to the first. The relator discontinued the use of the respondent's name after the 5th of January, and he says that he did not thereafter forward cases for prosecution. With these exceptions, however, he continued to exercise his general powers, without, as we have seen, informing the respondent of their nature. He was asked this question: "Q. And you went on doing the same things you had done before, excepting that you felt that the use of his signature, after you received no reply to that letter, was a delicate matter, which you preferred not to employ?"—to which he gave the following answer: "A. Yes; I

went on doing the same things. Many of my duties, however, were performed by Mr. Jolinson." The third charge related to the use of the commissioner's name. This, however, continued only until the 5th of January; and the explanation on that head is mainly significant as indicating that the relator realized that he should have the respondent's affirmative consent and authority—founded, of course, upon proper information—before attempting to exercise under the new administration one of the important powers vested in him by the preceding.

The remaining charges need not be specially considered. They relate to matters which occurred under the preceding administration, and some of them—the fourth and fifth—affect the relator in his relation to the present administration mainly because he kept his knowledge of these matters to himself, and failed to report what he knew. As to the sixth, the respondent seems to have thought that the previous system of canceling cases was injudicious. With that administrative question we have, of course, nothing to do. The very fact, however, that the respondent's judgment on that head differed from that of his predecessor, and that, when apprised of what had thus been done in a particular instance, he emphatically repudiated the method adopted, shows how important it was that the information originally asked of the employés should have been fully afforded him, and that nothing should have been withheld as to that combination of duties and methods which went to the root of the entire administrative system of the office.

Our conclusion in dismissing the writ, however, rests upon the charges which have been already discussed. As to these, we see no escape from the conclusion that the commissioner acted fairly and reasonably, and that his dissatisfaction with the relator's explanation was in good faith, and involved a proper exercise of judgment.

The writ should therefore be dismissed, and the action of the respondent confirmed, with $50 costs and disbursements of the appeal. All concur.